**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-----------------------------------------------------------------

A.C. and P.C., on behalf of R.C.,

                                Plaintiffs,

             - against -                       **COMPLAINT**

New York City Department of Education,            **08 CV 3360 (NRB)**

                             Defendant.

-----------------------------------------------------------------

       Plaintiffs, A.C. and P.C., on behalf of R.C., by their attorneys, Mayerson & Associates, as and for their Complaint, allege and states the following:

    1.  Plaintiff R.C., the son of plaintiffs A.C. and P.C., is a minor child who has been diagnosed with an autism spectrum disorder.  R.C. was at all relevant times was and is a student residing within the New York City School District entitled to all rights, entitlements, and procedural safeguards mandated by applicable law and statutes including, but not limited to the Individuals with Disabilities Education Improvement Act ("IDEIA"), 20 U.S.C. § 1400, *et. seq.*, the pertinent implementing regulations promulgated under the Code of Federal Regulations, Article 89 of the New York State Education law and Part 200 of the Commissioner's Regulations.

    2.  Plaintiffs A.C. and P.C. are the parents of R.C.  Plaintiffs are residents of the State of New York, residing at all relevant times at an address, in Manhattan, within the New York City School District.

    3.  R.C. and his parents A.C. and P.C. are not expressly named herein by their given names or specific address because of the privacy guarantees provided in the IDEIA statute, as well as in the Family Educational Rights Privacy Act, 20 U.S.C. § 1232(g) and 34 C.F.R. § 99.

4.  Defendant New York City Department of Education ("NYCDOE"), upon information and belief, is a duly constituted school district organized under the laws of the State of New York, and is the agency charged with the obligations to provide R.C. with a free and appropriate public education ("FAPE"), *see infra*, ¶ 8.

## THE RELIEF BEING SOUGHT

5.  This action is brought pursuant to the provisions of 20 U.S.C. § 1400, *et. seq.*, more commonly known as the IDEIA and, in particular, 20 U.S.C. §§ 1415(i)(2) and (3).  *See also*, 34 C.F.R. §§ 300.516 and 300.517.

6.  This action is being brought to secure statutory attorneys' fees that plaintiffs are entitled to recover pursuant to the fee-shifting provisions of the federal IDEIA statute, 20 U.S.C. §§ 1415(i)(3)(A)-(G).  A.C. and P.C., on behalf of R.C., should be awarded attorneys' fees as the "substantially prevailing party" in a due process hearing for the 2004-2005, and 2005-2006 and 2006-2007 (jointly) school years under New York City Impartial Hearing Office Case Numbers 59056 and 109000, respectively.

## JURISDICTION AND VENUE

7.  This Court, pursuant to 20 U.S.C. §§ 1415(i)(2) and (3), 34 C.F.R. §§ 300.516 and 300.517, 28 U.S.C. §§ 1331 and 1367, has jurisdiction of this action without regard to the amount in controversy.  Venue is proper in that plaintiff and defendant both reside in or are situated in this District.

8.  Pursuant to the IDEIA statute, as well as the New York State Education Law, all school agencies within the State are required to offer eligible students with disabilities special education

programs and services that are tailored to meet the individual needs of each child with a disability.  The FAPE required under IDEIA will be different for each child, as IDEIA does not permit a "one size fits all" approach.

### FACTUAL BACKGROUND FOR THE 2004-2005 SCHOOL YEAR

9.  On or about December 1, 2004, A.C. and P.C., through their attorneys, Mayerson & Associates, filed for an impartial hearing at the administrative level in an effort to secure reimbursement and other relief relating to the 2004-2005 school year for the cost and expenses of R.C.'s program and related services.  R.C.'s parents filed for due process due to the NYCDOE's failure to recommend and provide an appropriate placement and program individualized for R.C.'s unique special education needs.

10. The evidentiary hearing on this matter took place on July 29 and August 3, 2005.  Eric Nachman, Esq., of Mayerson & Associates represented the plaintiffs.  The NYCDOE effectively conceded they did not provide R.C. with an appropriate program (by not presenting a case), thereby sustaining (in plaintiffs' favor) Prong I of the Burlington/Carter test for relief.[1]

11. Plaintiffs entered 12 exhibits and the testimony of six witnesses into evidence in support of their case.  The NYCDOE did not offer any testimonial or documentary evidence challenging the appropriateness of the program privately arranged by M.C.'s parents.

12. By "Findings of Fact and Decision" dated September 12, 2005, Impartial Hearing Officer Michael S. Lazan, Esq., rendered an award in favor of plaintiffs, establishing plaintiffs as the

---

[1] Reference is made to School Committee of Burlington v. Dept. of Educ. of Massachusetts, 471 U.S. 359, 105 S.Ct. 1996 (1985), and Florence Court School Dist. Four v. Carter, 510 U.S. 7, 114 S.Ct. 361 (1993), which set the standards for determining whether a handicapped child's unilateral educational placement is eligible for reimbursement relief.

substantially prevailing party in the 2004-2005 administrative due process proceeding.[2] Defendant never appealed from this decision, which thus became final and non-appealable on or about October 17, 2005.

### FACTUAL BACKGROUND FOR THE 2005-2006 AND 2006-2007 SCHOOL YEARS

13. On or about December 1, 2004, A.C. and P.C., through their attorneys, Mayerson & Associates, filed for an impartial hearing at the administrative level in an effort to secure reimbursement and other relief relating to the 2005-2006 and 2006-2007 school years for the cost and expenses of R.C.'s tuition and related services.  R.C.'s parents filed for due process due to the NYCDOE's failure to recommend and provide an appropriate placement and program individualized for R.C.'s unique special education needs.

14. The evidentiary hearing on this matter lasted six days.  Gary S. Mayerson, Esq. and Randi M. Rothberg, Esq., of Mayerson & Associates represented the plaintiffs.  The NYCDOE conceded they did not provide R.C. with an appropriate program in both the 2005-2006 and 2006-2007 school years, thereby sustaining (in plaintiffs' favor) Prong I of the Burlington/Carter test for relief.  However, the NYCDOE challenged the appropriateness of plaintiffs unilateral placement (Prong II).

15. Plaintiffs entered 19 exhibits and the testimony of seven witnesses into evidence in support of their case.  The NYCDOE entered three exhibits and the testimony of two witnesses into evidence challenging the appropriateness of the program privately arranged by M.C.'s parents.

---

[2] A redacted copy of this decision is annexed hereto as Exhibit A.  Please note that all exhibits have been redacted so as to protect the privacy of the family.  See ¶ 3.

16. By "Findings of Fact and Decision" dated July 10, 2005, Impartial Hearing Officer Judith T. Kramer, Esq., rendered an award in favor of plaintiffs, establishing plaintiffs as the substantially prevailing party in the administrative due process proceeding.[3]  Defendant never appealed from this decision, which thus became final and non-appealable on or about August 15, 2005.

## CONCLUSION

17. The defendant is liable to pay plaintiffs their reasonable attorneys' fees arising out of R.C.'s successive IDEIA administrative due process proceedings, and in this action, at plaintiffs' counsel's current "prevailing" rates.   The fees requested herein are entirely reasonable and appropriate because:

(a) upon information and belief, plaintiffs' attorneys' office is the only firm in the country whose practice is devoted almost exclusively to representing children and adolescents with autism spectrum disorders, like R.C., in educational rights disputes;

(b) the principal of plaintiffs' attorneys' firm has testified before the United States Congress on the subject of the educational rights of children diagnosed with autism spectrum disorders;

(c) plaintiffs' attorneys have published and presented on the subject of the educational rights of children diagnosed with autism spectrum disorders;

(d) plaintiffs' attorneys have special knowledge and expertise concerning the educational needs of children diagnosed with autism spectrum disorders;

---

[3] A redacted copy of this decision is annexed hereto as Exhibit B.  Please note that all exhibits have been redacted so as to protect the privacy of the family.  See ¶ 3.

(e) plaintiffs' attorneys' office has represented children with autism spectrum disorders in numerous states across the nation, and has consulted to families outside of the United States; and

(f) to the extent that there is a "prevailing rate" in the Southern District of New York for sophisticated autism intervention cases, plaintiffs' attorneys' prevailing rates are reasonable and within the applicable standard.

18. Necessary duties involved with preparing R.C.'s cases for administrative due process hearings for the 2004-2005, 2005-2006 and 2006-2007 school years included, but were not limited to: (a) corresponding with plaintiff and R.C.'s service providers; (b) holding numerous telephone conferences; (c) writing and filing impartial due process hearing requests; (d) reviewing and disclosing documentary information relevant to R.C.'s claims; (e) scheduling and preparing witnesses to testify at the hearings; (f) developing effective case presentations for the 2004-2005 and 2006-2007 school years; and (g) preparing closing statements.

19. Additional fees and costs have been incurred, and will continue to be incurred in this action.

20. For all of the above efforts, plaintiffs should be awarded attorneys' fees, related costs and disbursements for the 2004-2005, 2005-2006 and 2006-2007 school years in an amount to be set by this Court, at plaintiffs' counsel's prevailing rates.

## PRAYER FOR RELIEF

WHEREFORE, by reason of the foregoing, this Court should (a) fix and award plaintiffs their statutory attorneys' fees and related costs and disbursements from the IDEIA due process proceedings for the 2004-2005, 2005-2006 and 2006-2007 school years in an amount to be set by

the Court, at plaintiffs' counsel's prevailing rates, (b) award plaintiffs the attorneys' fees and

related costs and disbursements associated with this action in an amount to be set by the Court,

and (c) award plaintiffs such other, different and further relief as this Court deems proper.


Dated: April 4, 2008
      New York, New York                   Gary S. Mayerson (GSM 8413)
                                              Mayerson & Associates
                                              330 West 38th Street, Suite 600
                                              New York, New York 10018
                                              (212) 265-7200
                                              (212) 265-1735 (facsimile)
                                              admin@mayerslaw.com

# FINDINGS OF FACT AND DECISION

Case Number:                59056

NYS Case Identifier Number: 14231

Student's Name:             R███ C███

Date of Birth:              June 2, 2000

District:                   2

Hearing Requested By:       Parent

Date of Hearing:            July 29, 2005
                            August 3, 2005

Hearing Officer:            Michael S. Lazan, Esq.

Hearing Officer's Findings of Fact and Decision                                    1

Case No.   59056

NAMES AND TITLES OF PERSONS WHO APPEARED JULY 29, 2005

| | | |
|---|---|---|
| Eric Nechem | Attorney | Parent |
| Tania Cohen | Intern | Parent |
| D███ C███ | Father | |
| R███ C███ | Mother | |
| Justine Deluse (Via Telephone) | Occupational Therapist | Parent |
| Donna Orloff (Via Telephone) | Speech Therapist | Parent |
| Mary Lowry (Via Telephone) | ABA Supervisor, McCarter School | Parent |
| Frances Zawacky | Chairperson Designee, CPSE Administrator, Region 9 | Department of Education |

NAMES AND TITLES OF PERSONS WHO APPEARED AUGUST 3, 2005

| | | |
|---|---|---|
| Eric Nechem | Attorney | Parent |
| Simon Fraenkel | Intern | Parent |
| Harvey Weisman (Via Telephone) | Director | Parent |
| Frances Zawacky | Chairperson Designee, CPSE Administrator, Region 9 | Department of Education |

Hearing Officer's Findings of Fact and Decision                                    2

Case No.   59056

_____

On July 29, 2005 and additional dates, the matter of Ryan C. came before me as impartial hearing officer pursuant to the Individuals with Disabilities Education Act, 20 U.S.C.                    §1415(f)(1).  Appended to the record are the names of the persons who    appeared.     The  hearing  was  convened  on  the  parent's  request  for  tuition reimbursement for 2004-2005 for 26 hours a week of Applied Behavioral Analysis (ABA) services, quarterly meetings, and 2 hours a week of speech and language therapy services at McCarten Center. The request is for a 12-month program.

The matter was extended numerous times; in every instance, the extensions were on joint application because of extensive testimony, the complexity of the issues, the briefing schedule, and the decision writing process. The extensions were through September 8, 2005.  Documentation in support of the extensions is on file at the NYC Impartial Hearing Office. The record close date was September 1, 2005.

### THE TESTIMONY OF THE PARTIES

Justine DeLuse, an occupational therapist, works for SPOTS, an OT provider. (Tr. At 11) R███ came in with sensory issues, delays in gross motor skills, fine motor skills, auditory processing and strength and endurance issues. (Tr. At 12)  In fine motor and visual morow skills, he is at 60 months now being about 26 months last year. (Tr. At 12) She works with him twice a week for 45 minutes. (Tr. At 13)

He is unable to filter out auditory distractions and focus. (Tr. At 14)  You cannot touch him unless he is prepared for it. (Tr. At 14)  He will not touch substances like glue or paint. (Tr. At 14)
This dysfunction has diminished. (Tr. At 15)

Socially, he is a completely different child from last year. (Tr. At 15)  He didn't interact with the other kids last year. (Tr. At 15)  This year, he will cheer kids on, share with them, play catch. (Tr. At 15)

He will put on his shoes now, put on his socks, jacket. (Tr. At 16)

His biggest problem is fine motor skills. (Tr. At 17)  He needs  a better hand grasp. (Tr. At 17)  His skills have improved over last year. (Tr. At 17)

They have employed strengthening exercises, endurance exercises. (Tr. At 19)

She has noticed improvement in his language. (Tr. At 19)  He will now take two or three step directions. (Tr. At 21)

There would be regression if he went without services for a few months. (Tr. At 22)

She feels that he should receive services 2x60. (Tr. At 23)  A lot more could be done in an hour; there are pretty significant delays, the Tuesday sessions seem to take longer because he needs to get back into the routine. (Tr. At 24)

Mary Lowry, director of ABA at McCarten, indicated that Ryan presented with little eye contact, was not verbal, didn't attend to tasks, tantrumed. (Tr. At 26)  His therapists report to her. (Tr. At 27) Also, she provides 4 hours of direct service weekly. (Tr. At 27)

The Center provides an array of services for children with developmental disabilities, mostly autism and PDD. (Tr. At 27)

Goals for 04-05 focused mainly on socialization, academic work and skills such as transitioning, toileting. (Tr. At 28)

He has made tremendous progress. (Tr. At 28)  He now initiates play with children, transitions better, with attend to activities better, sit. (Tr. At 28) He still has trouble actually learning in a group. (Tr. At 28)  He is beginning to imitate. (Tr. At 29)

He has the intent to communicate, but is often unintelligible. (Tr. At 29) There is much work done on his pronunciation. (Tr. At 30)  He has done much better in these areas, and now wants to tell stories. (Tr. At 30) It is helpful to have a one-on-one interaction because he is unintelligible. (Tr. At 31)

Improvements have been noted in gross motor skills, fine motor skills, visual motor skills. (Tr. At 31)

There have been improvement in receptive skills. (Tr. At 32)

He must have a very structured setting. (Tr. At 33)

Academically, they work on primer level. (Tr. At 34) Letter recognition, number recognition and the like. (Tr. At 35)

He has become more consistent with this. (Tr. At 36)

Hearing Officer's Findings of Fact and Decision                                    4

Case No.   59056

_____

Regression would be apparent if he missed time over the summer. (Tr. At 36)  He often needs to revisit skills that he has learned. (Tr. At 36)

From McCarten, he receives 24 hours of services a week, plus 2 hours a week of speech language. (Tr. At 37) special education itinerant teacher (SEIT) and ABA work are billed at 125 per hour; supervision is at 160 dollars per hour. (Tr. At 38)  Speech is billed at 145 per hour. (Tr. At 39)  There are usually 2 hours of supervision per week. (Tr. At 38)  Supervision entails checking on his progress, going to see him at school, program development, looking at his data. (Tr. At 38) If there is no progress, they will look at it. (Tr. At 39)

The quarterly team meetings are charged per therapist who is there. (Tr. At 39) Progress, adjustments, improvements are discussed. (Tr. At 40)

One-to-one support is crucial to Ryan to facilitate language, socialization, to help him focus. (Tr. At 40)  They will adapt material for him. (Tr. At 45)  He is unable to learn in a group situation. (Tr. At 45)

He is in school from Monday to Friday, 8:45 to 1:00. (Tr. At 41)  In school, the ABA skills are generalized. (Tr. At 42)

20 of his 24 hours of services are provided at school. (Tr. At 43)   The other four hours are at home, where they work on learning in school, writing skills. (Tr. At 43)

The 20 hours are at Barrow Street, where there are 12 or so other "mainstream" children. (Tr. At 48)   He has a one-to-one instructor at the school called Rea or Avi who are ABA trained. (Tr. At 49)  They cost 130 per hour. (Tr. At 50)  This was corrected to 125. (Tr. At 52)

Four hours are provided after school. (Tr. At 50)  Before summer started, two extra hours were provided at McCarten. (Tr. At 50)  These were for ABA services by Avi at 125. (Tr. At 51)

At the quarterly meetings, there are the parents and the two ABA teachers and herself.      (Tr. At 53)   The meetings last an hour. (Tr. At 53)

The speech therapist, Evie Libien, has a master's and a certification. (Tr. At 89-90)  She uses prompt therapy; he is making progress with this prompt. (Tr. At 90) This helps him to articulate more clearly. (Tr. At 90) The charge is 145 dollars for Evie's

Hearing Officer's Findings of Fact and Decision                                    5

Case No.   59056

---

services. (Tr. At 93) Sometimes Evie will perform speech once a week because of scheduling. (Tr. At 93) During summer it is once a week. (Tr. At 93)

Harvey Weissman, controller of McCarten, indicated that the parents had paid all up to the April invoice. (Tr. At 108)

Donna Orloff, a speech and language therapist, sees R███ twice a week. (Tr. At 57)  At 3 ½, there were problems with expressive language, unintelligibility, an inability to express himself, he was uncommunicative. (Tr. At 57)  Now, there have been really nice changes, though there is a severe delay in expressive. (Tr. At 58)  Vocabulary has grown, he can label most objects, there are fewer "meltdowns." (Tr. At 58)

He is helped by prompts. (Tr. At 60)  More work is needed on expressive language, receptive language. (Tr. At 61)

If the program were discontinued over the summer, there would be severe regression. (Tr. At 63)

Speech 5 times a week is absolutely critical. (Tr. At 64)

He is making progress with her speech and the speech provided by the McCarten providers. (Tr. At 64)  He does receive speech from McCarten, two hours a week. (Tr. At 64)

The mother indicated that R███ did not have a CPSE meeting for the 2004-2005 year. (Tr. At 70) They paid for SEIT services through McCarten; he gets SEIT for school, from 9-1 daily. (Tr. At 71) It is two hours a day on Thursday and Friday and on Monday during the school year. (Tr. At 71)

There is two hours of speech from Dr. Orloff. (Tr. At 71) Two hours of speech from McCarten, three if they can "fit it in." (Tr. At 71)

There has been improvement in speech. (Tr. At 73) He now has words, puts words together. (Tr. At 73) He could use more OT than 2x45. (Tr. At 73) He has improved with his motor skills. (Tr. At 73)

He is doing well at Barrow Street. (Tr. At 74) He likes to be around other children and imitates them. (Tr. At 75)

The provider at McCarten is "Evie." (Tr. At 86)

Verbally, socially, he's come a long way. (Tr. At 75)

Hearing Officer's Findings of Fact and Decision                                    6

Case No.   59056

---

The father testified that he has accepted services from the Department of Education before in the area of speech. (Tr. At 79)

McCarten costs about $12,000 a month. (Tr. At 80) Speech and language are another $2,000.   (Tr. At 80)

He has seen improvement in his speech, physical skills, ability to string words together. (Tr. At 83)

## FINDINGS AND DISCUSSION

The District may be required to pay for educational services obtained for a student by a student's parents if the services offered are inadequate or inappropriate ("prong one"), the services selected by the parent are appropriate ("prong two"), and equitable considerations support the parents' claim ("prong three").   School Committee of the Town of Burlington v. Dep't of Education, Massachusetts, 471 U.S. 359 (1985).   The District bears the burden of demonstrating the appropriateness of the program recommended by its CSE.   Application of a Child with a Disability, Appeal No,. 93-9. To meet its burden, the District must show that the recommended program is reasonably calculated to allow the child to receive educational benefits, Bd. of Ed. Hendrick Hudson CSE v. Rowley, 458 U.S. 176 (1982).

The District did not put on a case and therefore conceded on "prong one." Regarding "prong two," there is clear and convincing evidence that the McCarten Center has provided appropriate SEIT services to this child over the course of the 12 month 2004-2005 school year.   There is unrebutted testimony that the program --created through the services at McCarten — has produced gains in speech, gross motor, fine motor, transitioning, social skills, processing and sundry other areas.   There was no argument from the district that these services were not appropriate.   Accordingly, the parents prevail on "prong two."   Finally, there is no evidence that the parents did not cooperate with the District.   Accordingly, the parents are awarded full reimbursement for services.[1]

---

[1] Regarding the parents' request for statutory interest on the payments, the parents did not submit any authority supporting this view.   A review of New York SRO decisional law reveals no authority for Districts paying statutory interest.   The request is denied.

Hearing Officer's Findings of Fact and Decision                                      7

Case No.   59056

---

## ORDER

It is hereby ordered that the Department of Education reimburse the parents for R███s SEIT services at McCarten for 2004-2005 for up to 26 hours a week during the school year, 24 hours during the summer.  The Department of Education will reimburse for up to two hours of speech and language therapy per week at McCarten. Reimbursement is conditional upon the parents providing the District with appropriate proof of payment as per Application of the New York City Department of Education, Appeal No. 05-065.

Dated:  September 12, 2005

*Michael S. Lazan*

MICHAEL S. LAZAN, ESQ.
Impartial Hearing Officer

ML:ds

## PLEASE TAKE NOTICE

Within 35 days of the date of this decision, the parent and/or the New York City Department of Education has a right to appeal the decision to the State Review Officer of the New York State Education Department under Section 4404 of the Education Law and the Individuals with Disabilities Education Act.

"The notice of intention to seek review shall be served upon the school district not less than 10 days before service of a copy of the petition for review upon such school district, and within 25 days from the date of the decision sought to be reviewed.  The petition for review shall be served upon the school district within 35 days from the date of the decision sought to be reviewed.  If the decision has been served by mail upon petitioner, the date of mailing and the four days subsequent thereto shall be excluded in computing the 25- or 35-day period." (8NYCRR279.2[b])  Failure to file the notice of intention to seek review is a waiver of the right to appeal this decision.

Directions and sample forms for filing an appeal are included with this decision.  Directions and forms can also be found in the Office of State Review website: www.sro.nysed.gov/appeals.htm.

Hearing Officer's Findings of Fact and Decision                                    8

Case No.   59056

## DOCUMENTATION ENTERED INTO RECORD JULY 29, 2005

| | | |
|---|---|---|
| 1. | Due Process, 1 p. | Parent |
| 2. | Speech and Language Progress Report, 4 pp. | Parent |
| 3. | Programming and Progress Report, 5 pp. | Parent |
| 4. | Specialized Program and OT Services Progress Report, 4 pp. | Parent |
| 5. | IEP, 20 pp. | Parent |
| 6. | Social History, 2 pp. | Parent |
| 7. | Psychological Evaluation, 3 pp. | Parent |
| 8. | Occupational Therapy progress Report, 4 pp. | Parent |
| 9. | Programming and Progress Report, 6 pp. | Parent |
| 10. | McCarten's Center Invoices, 9 pp. | Parent |
| 11. | Cancelled Check to McCarten's Center | Parent |

## DOCUMENTATION ENTERED INTO RECORD AUGUST 3, 2005

| | | |
|---|---|---|
| 12. | Invoices, 21 pp. | Parent |

## FINDINGS OF FACT AND DECISION

Case Number:            109000

Student's Name:         R█████C███████

Date of Birth:          June 2, 2000

District:               2

Hearing Requested By:   Parent

Dates of Hearing:       February 2, 2007
                        February 7, 2007
                        March 21, 2007
                        April 27, 2007
                        June 6, 2007
                        June 6, 2007

Hearing Officer:        Judith T. Krammer, Esq.

Hearing Officer's Findings of Fact and Decision                               1

Case No.  109000

---

## NAMES AND TITLES OF PERSONS WHO APPEARED FEBRUARY 2, 2007

| | | |
|---|---|---|
| Gary Mayerson (Via Telephone) | Attorney | Parent |
| Fredda Clarke (Via Telephone) | Chairperson Designee, CSE Region 9 | Parent |

## NAMES AND TITLES OF PERSONS WHO APPEARED FEBRUARY 7, 2007

| | | |
|---|---|---|
| Gary Mayerson | Attorney | Parent |
| Ira Fybish | Chairperson Designee, CSE Region 9 | Parent |

## NAMES AND TITLES OF PERSONS WHO APPEARED MARCH 21, 2007

| | | |
|---|---|---|
| Gary Mayerson | Attorney | Parent |
| D███ C█████ | Parent | |
| Laura Prestia (Via Telephone) | Speech/Language Pathologist | Parent |
| Leslie Catapano (Via Telephone) | Occupational Therapist | Parent |
| Nilofer Naqvi | Chairperson Designee, CSE Region 9 | Department of Education |

## NAMES AND TITLES OF PERSONS WHO APPEARED APRIL 27, 2007

| | | |
|---|---|---|
| Randi Rothberg | Attorney | Parent |
| F██ C█████ | Parent | |
| Zubeida Uliah (Via Telephone) | SEIT | Parent |
| Stephanie Stenmon (Via Telephone) | McCarton School Teacher | Parent |
| Nilofer Naqvi | Chairperson Designee, CSE Region 9 | Department of Education |

Hearing Officer's Findings of Fact and Decision                                2

Case No.  109000

_____

NAMES AND TITLES OF PERSONS WHO APPEARED JUNE 6, 2007

| | | |
|---|---|---|
| Gary Mayerson | Attorney | Parent |
| P█████C█████ | Parent | |
| D█████C█████ | Parent | |
| Nilofer Naqvi | Chairperson Designee, CSE Region 9 | Department of Education |

NAMES AND TITLES OF PERSONS WHO APPEARED JUNE 7, 2007

| | | |
|---|---|---|
| Gary Mayerson | Attorney | Parent |
| P█████C█████ | Parent | |
| D█████C█████ | Parent | |
| Evy Feldman (Via Telephone) | Executive Director, McCarton School | Parent |
| Nilofer Naqvi | Chairperson Designee, CSE Region 9 | Department of Education |
| Lois Seigler (Via Telephone) | Special Education Teacher | Department of Education |
| Rosetta Pervan (Via Telephone) | School Psychologist | Department of Education |

Hearing Officer's Findings of Fact and Decision                                          3

Case No. 109000

---

## INTRODUCTION

On February 2, 2007 an impartial hearing was commenced pursuant to the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. §1415 regarding a parental request tuition reimbursement for the 2005-2006 and 2006-2007 school years for The child C.("the child ") and for a declaratory judgment that the child's classification on his IEP for the 2005-2006 school year was incorrect. The hearing was held on February 2 and 7, April 27, June 6 and 7, 2007 at the Impartial Hearing Office of the Board of Education of the City of New York located at 131 Livingston Street, Brooklyn, New York.

A list of exhibits that were admitted into evidence is attached to this decision.

## BACKGROUND

In 2005-2006 the child attended Barrow Street Nursery School with a special education itinerant teacher (SEIT) 20 hours a week and 5 times 30 minutes of speech and language therapy and 3 times 30 minutes of occupational therapy. For the academic year 2006-2007 placement was at McCarton School with inclusive related services and parent training as part of the placement. Individualized Education Programs (IEPs) created in both of those years contain a classification of speech and language impaired.

In February 2007, an order was issued granting the parents pendency relief for the 2006-2007 school year for reimbursement for up to 26 hours per week of SEIT services at McCarton during the school year; 24 hours per week of SEIT services at McCarton during the summer or 2007; and two hours of speech and language therapy per week at McCarton.

## THE PARENTS' POSITION

The parents contend that they are entitled to receive tuition reimbursement for the 2005-2006 and the 2006-2007 school years because the district conceded that they failed to offer the child a free appropriate public education (FAPE) in both year, the placements chosen by the parents were appropriate and the equities favor them. Specifically, for 2005-2006, petitioners seek reimbursement for the costs of (a) the child's tuition at the Barrow Street Nursery School, and (b) the child's SEIT support, in school and at home.

Hearing Officer's Findings of Fact and Decision                                    4

Case No. 109000

For 2006-2007, petitioners seek reimbursements for the costs of (a) the child's tuition at the McCarton School, which is a 12-month program running from September, 2006 through August, 2007.

They further contend that the child was incorrectly classified in both years and seek declaratory relief insofar as the Department of Education (DOE) has incorrectly classified The child, and seek a ruling that the NYCDOE always should have classified The child as "Autistic."

## THE DOE'S POSITION

The DOE concedes that it failed to offer the child a FAPE in 2005-2006 and 2006-2007 but that the placement chosen by the parent for the 2005-2006 school year was inappropriate. The DOE further contends that the classification of the child during the two years at issue was correct.

## THE EVIDENCE PRESENTED

The child's classification

Dr. Cecelia McCarton diagnosed the child with having PDD-NOS (an autism spectrum disorder) when the child was two years old. (Tr. 284)[1] Based upon personal observation, Dr. Ivy Feldman, Educational Director for the McCarton School (The child's placement for the 2006-2007 school year) noted that The child "has deficits that are characteristic of a child with an ASD, an autistic spectrum disorder." (Tr. 490) The child presents with significant speech and language delays and "an overall developmental delay." (Tr. 85) He also presents with behaviors consistent with those associated with autism spectrum disorders, including frustration over an inability to communicate effectively, as well as protesting. (Tr. 118)

Ms. Catapano, the child's occupational therapist at McCarton testified that the child does not present with an autism spectrum disorder (Tr. 85). The child's speech and language therapist also testified that the child's speech and language issues are his primary handicapping condition (Tr. 120). In a report from January 2006, Dr. Bedi, a

---

[1] The C████s' shared Dr. McCarton's report with the NYCDOE. (Tr. 389)

Neuropsychologist, indicates that the child presents with a diagnosis of Mixed Receptive and Expressive language disorder.

Dr.  Rosetta Pervan testified that the medical diagnosis of autism in a child could be made as early as two years old. (Tr. 548).  She also saw the PDD-NOS diagnosis made by Dr. Mc Carton when the child was two years old. She further testified that when a child is very young it is difficult to decide what the primary problem is. (Tr. 500-551, 533) PDD is a global general classification given to a child who is having difficulties in many areas. It is an undifferentiated diagnosis. (Tr. 535). As the child gets older, the deficits get more differentiated and it is easier to see them over time. Id.

She also testified that there is a difference between an educational classification and a medical diagnosis and how it is the team's responsibility to classify according to where the deficits are seen (Tr. 551). The DOE has a list of classifications from the State and children with PDD are often classified as speech and language impaired because the deficits are seen there and it is an educational classification, not a medical classification.

### The child's placement in 2005-2006

The child attended the Barrow Street Nursery School, with SEIT support.  He also received related services from the DOE. His classification on the IEP for that school year was speech and language impaired. (Parent's Ex. C) He was to receive 5 thirty-minute sessions of speech and language therapy 1:1. Id. The recommended service was "deferred to CBST". Id. The DOE concedes that no placement was offered to the child for that year.

Zubeida Ullah, The child's SEIT for the 2005-2006 school year, holds a Master's degree in elementary and special education. (Tr. 156, 160; Ex. P-M, pp. 4-5)  Both in school and at her job, she has received training in working with children with a variety of disabilities. (Tr. 158)  Ms. Ullah is permanently certified as a special education teacher, as well as temporarily certified as an elementary school teacher, in New York State. (Tr. 156; Ex. P-M, p. 5)  From 1999 through 2003, Ms. Ullah worked at the Barrow Street Nursery School, first as a substitute teacher and then as a classroom teacher. (Tr. 158-159) She has been a SEIT since 2003, directly working with children and helping them to meet their IEP goals. (Tr. 157-158)

Ms. Ullah delivered 20-25 hours per week of SEIT services in accordance with a contract with the child's parents during 2005-2006. (Tr. 161; see Ex. P-M) She attended the Barrow Street Nursery School with The child for four hours per day, five days per week, i.e., all the time that the child was at school. (Tr. 161, 334-335) Ms. Ullah also worked with the child at his home approximately one hour per week, and noted: "The home piece was crucial to create that home school connection for the child." (Tr. 180-181) Within the home, Ms. Ullah trained the parents in techniques and strategies to use while working with the child, and Mrs. C███████testified that Ms. Ullah was "very good". (Tr. 301, 308, 352) Ms. Ullah's fee was $80 per hour, which is within fair market value for someone of her skill and experience level. (Tr. 178-179; see Ex. P-M, p. 2) Ms. Ullah was supervised by Elizabeth Cecil, a licensed social worker, but did not charge the C██████s for her time spent with Ms. Cecil. (Tr. 179)

The Barrow Street Nursery School does not provide special educational services. The child's class at the Barrow Street Nursery School consisted of approximately 16 students, some of whom served as models for him. (Tr. 161-162, 169) There was a lead teacher and an assistant teacher. The evidence is silent as to whether either if them were trained as special education teachers. Three of the other children besides the child also attended school with SEITs. (Tr. 162) Some of the other students had speech and language delays and behavioral delays. (Tr. 318, 351) Ms. Ullah was in contact with the child's schoolteachers on a daily basis. (Tr. 167) Modifications were put into place for the child. (Tr. 169) Ms. Ullah tracked the child's progress over the course of the year with daily and weekly session notes and meetings with his teachers. (Tr. 176) Ms. Ullah testified that the Barrow Street School, with her SEIT support, was an appropriate setting for the child during the 2005-2006 school year. (Tr. 177)

Ms. Ullah testified that with her support, the child had the opportunity to develop his social skills. (Tr. 162) In the beginning of the school year, the child could only "parallel play" with his classmates, due to his interfering behaviors. (Tr. 163, 166) By the end of the year, however, she testified that he was more able to play and communicate with his peers. (Tr. 164, 166-167) She testified that the child's pre-academic skills and

Hearing Officer's Findings of Fact and Decision                    7

Case No.  109000

---

language skills also further developed in 2005-2006.  She stated that began to respond to questions with more meaningful answers. (Tr. 164-166) She testified that he became a more active listener with greater attention and that his articulation skills also improved, as did his fine motor and graphomotor skills. (Tr. 172-173) She added that the child became able to create story lines behind his block-building work and that his practical problem solving skills also improved. (Tr. 174) She stated that he had some counting skills  (Tr. 326) and that the child also became less resistive. (Tr. 174)  By the end of the year, she testified that he was able to follow the classroom routine moving with the class from space to space. (Tr. 175-176)  However, Ms. Ullah testified that the program at Barrow Street did not meet his speech and language needs (Tr. 165)

R███ C████, the child's mother, testified that she placed the child at the Barrow Street Preschool in 2005-2006 in order to keep him in his least restrictive setting.  She testified that she and A███ C████, the child's father, "were trying to help [The child's] socialization skills, but he had to have the SEIT with him all the time." (Tr. 303; see also Tr. 308) Mr. C████ testified that the child's 2005-2006 program "helped with socialization skills...." (Tr. 397)  The child's mother also noted that Ms. Ullah became increasingly skilled at working on the child's interfering behaviors. (Tr. 330).

Lois Seigler, a special education teacher for the DOE who participated in the child's April 21, 2005 IEP meeting, observed the child twice while he attended the Barrow Street Nursery School: once in Spring 2005 and once in Spring 2006. (Tr. 452, 453, 477)  She noted that the child had some difficulties functioning in such a large classroom. (Tr. 461-462)  She considered the Barrow Street Nursery School an appropriate placement for the 2004-2005 school year but an inappropriate placement for the child during the 2005-2006 school year. (Tr. 468)  She testified that she didn't see any learning. (Tr. 468-469)

The child's teacher at Mc Carton School , Ms. Stenmon, testified that the child was lacking many basic skills when he arrived at Mc Carton school after a year at Barrow Street (Tr. 248). Ms. Ullah testified that the school offered the child the opportunity to integrate with non-disabled peers to work on his social skills (Tr.   )  Ms. Stenmon

indicated that at the start of the year he was not ready to be integrated with non-disabled peers (Tr. 250). Ms. Stenmon stated that she would need to systematically monitor his tantrums to document his improvement and that a narrative method favored by Ms. Ullah (Tr. 199) would not be effective (T. 255).

Ms. Ullah testified that the program at Barrow Street was supposed to work on basic pre-academic skills (Tr. 164). However, Ivy Feldman, Director of McCarton School testified  that she would have expected a child in an integrated setting to have more developed academic skills (Tr. 517).

The equities for 2005-2006

An IEP meeting was held to plan for 2005-2006, on April 21, 2005.  (See Ex. C). At the IEP meeting, the parents informed the CSE that they would be providing the child with the types of services he received in 2004-2005, and seeking reimbursement from the DOE.  (Tr. 296)  At that point, the DOE had not offered the child a program, and the parents never heard back from the CBST. (Tr. 296, 364, 452-455))  According to the parents, the DOE's personnel told them that they should keep the child at  Barrow Street with SEIT support, where he had previously attended, along with the related services accepted on a "without prejudice" base for the child.  (Tr. 365, 367-370)

Ms. Seigler, who was present at the CSE meeting in question denied that the parents were ever told that they should keep him at Barrow Street because it wasn't a public school. (Tr. 479). She testified that the parents would have been told that the related services on the IEP would be modified and continued as modified. (Tr. 479) She denied telling them that SEIT should continue because it is solely a pre-school age program and the child was turning five in June 2005. (Id.)

The child's 2006-2007 placement at Mc Carton School

For 2006-2007, the child transitioned from the Barrow Street Nursery School to the McCarton School.  The McCarton School is a not-for-profit school that specializes in educating children with presentments typical of autistic spectrum disorders. (Tr. 524, 485)  Applied Behavior Analysis ("ABA") is the core intervention approach used at the McCarton School and children are grouped according to their functioning levels. (Tr. 492,

494) In addition to ABA instruction, there is a speech and language therapist imbedded in each classroom. (Tr. 495) There are weekly team meetings, as well as full staff meetings with the entire school. (Tr. 497-498) As part of the twelve-month program covered by the tuition, each student receives a minimum of five 60-minute one-on-one speech therapy sessions per week and five 45-minute one-on-one occupational therapy sessions per week. (Tr. 495-496) Mrs. ████ testified that the switch was made because The child "needed more speech and language and he needed to be in a one-on-one situation.... [The McCarton School] would include occupational therapy. He'd be in one place." (Tr. 316) Furthermore, The child was ready to "age out" of the Barrow Street Nursery School's program. (Tr. 317, 385-386)

Dr. Feldman, the McCarton School's Educational Director since September 2002, is responsible for curriculum at the school and supervision of the development of each student's IEP and Behavior Intervention Plan ("BIP"). (Tr. 484-485) Dr. Feldman and the Associate Educational Director, Jacqueline Hickey, supervise the teachers at the school and hold weekly meetings to discuss each of the students. (Tr. 497-498)

Dr. Feldman first observed the child at the Barrow Street Nursery School in June, 2006, when she was considering his application for placement at the McCarton School. (Tr. 504) Dr. Feldman knew that Dr. McCarton had diagnosed the child as having PDD , and more recently observed that the child exhibited "deficits that are characteristic of a child with ASD, an autistic spectrum disorder." (Tr. 489-490) Insofar as the January 2006 neuropsychological evaluation by Dr. Gail Bedi only mentions a diagnosis of "Mixed Receptive-Expressive Language Disorder," Dr. Feldman disagrees with this diagnosis. The child displays other symptomology, such as lack of social skills and rigidity that are not encompassed in a language disorder. (Tr. 509) Speech and language impairment is one of the hallmark deficits of a child on the autistic spectrum. (Tr. 518)

The child is making meaningful progress at the McCarton School., per Dr. Feldman. He presented with both behavioral excesses and deficits. (Tr. 499) He is in a classroom with other students of comparable functionality level, where most of the students are working on pre-academic and socialization skills. The child receives ABA

Hearing Officer's Findings of Fact and Decision                                    10

Case No. 109000

---

intervention in the classroom in both one-on-one and group settings. (Tr. 493-494)  The McCarton School has been and continues to be an appropriate placement for the child, as evidenced by his level of progress to date. (503-504)

Stephanie Stenmon, an ABA teacher in the child's classroom, holds a Master's degree in Early Education.  She is supervised by Dr. Feldman and meets with her every week to discuss the child's program. (Tr. 212-213)  There are five teachers (including Ms. Stenmon and three other ABA instructors, as well as a speech pathologist, Laura Prestia) and five students in the child's classroom. (Tr. 214)  Ms. Stenmon and the other teachers maintain constant communication, both by working side-by-side in the classroom and communicating during the weekly meeting. (216)  Ms. Stenmon also maintains daily contact with the child's parents. (Tr. 230)

Ms. Stenmon works with each student, including the child, individually for at least 45 minutes per day. (Tr. 215)  According to Ms. Stenmon, the child presented with characteristics consistent with a child on the autistic spectrum. (Tr. 218)  His initial ABLLS assessment indicated that the child had very poor academic skills, such as reading and math. (Tr. 221)  He did not know his letters. (Tr. 219-220)  His tantrums would last up to 35 minutes per day. (217)  The child was unable to interact with peers without tantrumming. (Tr. 250)  The McCarton School was a more challenging and demanding setting than the child had experienced in the past. (Tr. 253)

The child's BIP was developed at the McCarton School. (Tr. 249-250) The child's McCarton School IEP was developed specifically for him and all of the people involved with the child participated in its development. (Tr. 222-223)  All of the programs on the child's IEP are constantly reviewed to determine his progress. (Tr. 227)  Ms. Stenmon graphs the child's progress and develops his daily programming, with oversight by Dr. Feldman. (Tr. 218)  All of the other teachers who work with the child also take data. (Tr. 219)  The child engages in group activities at the McCarton School, but a one-to-one student-teacher ratio is maintained. (Tr. 232)  Ms. Stenmon has visited the child's home to assist with his behaviors in that environment. (Tr. 230-231)  The child uses assistive technology, DynaVox, for expressive communication. (Tr. 228)

Ms. Stenmon testified that the child's skills have improved since September 2006. His tantrumming is down to no more than two minutes per day. (Tr. 217) His personal assaults are down to zero. (Tr. 226) His attention has improved dramatically, and "[h]e is able to focus on a teacher and only occasionally is he distracted by other things in the room." (Tr. 241) The child has made gains in communication: For example, he is able to articulate Ms. Stenmon's name ("Stephanie"), whereas before it was just "Stebbie." He is using "Can I have?" or "like" rather than "I want" all the time. (Tr. 229) He is doing well on making spontaneous requests. (Tr. 238) He responds to his name and will wave hello without prompting. (Tr. 234) He is able to follow direction, which he was unable to do at the beginning of the year. (Tr. 235) He is currently working on compliance with commands. (Tr. 226) With living skills, the child has mastered brushing his teeth, and is able to ask to use the bathroom (rather than "go pee-pee") and zip and unzip zippers. (Tr. 245)

The child is able to receptively identify and express all his letters. (Tr. 244) Vocal and verbal imitation program has been put on hold because of the difficulty distinguishing between the child's /m/, /b/, and /f/ sounds, but he working on it with the speech therapist. (Tr. 237) The child is making slow progress with intraverbals (fill in the blank sentences). (Tr. 240) He now is working on rote counting 1 through 20, whereas at the beginning of the year he was unable to count to five. The child is able to match within a field of six, and imitate motor skills. He has mastered patterns. (Tr. 243-244)

The child requires services on a full-year basis because "he easily loses skills that he's acquired." (Tr. 245-246) If the child is left to his own devices, he will do the same thing over and over again. (Tr. 231) The McCarton School setting is an appropriate setting for the child: The data shows that his skills have markedly improved since his arrival. (Tr. 247) In a classroom of 10 to 12 students the child would be too easily distracted and his confidence level would drop, and he would not make the progress he is currently making if he were in a larger classroom. (Tr. 251)

At the McCarton School, the child has access to a sensory gym where he receives occupational therapy nearly every school day. (Tr. 77-78, 88-89) The sensory gym is

Hearing Officer's Findings of Fact and Decision                                    12

Case No. 109000

_____

outfitted with mats, swings, a rock climbing wall, a trampoline, therapy balls, a hammock swing and other equipment with which he can receive sensory input during and between his occupational therapy sessions. (Tr. 78, 91-93). For the majority of the time that the child is in the sensory gym, other children are also there; this affords the child an opportunity to work on his social skills. (Tr. 96) Leslie Catapano, M.S., OTR/L, works one-on-one with the child for three 45-minute sessions per week. Bari Toor, another occupational therapist at the McCarton School with whom Ms. Catapano collaborates, also works one-on-one with the child for two 45-minute sessions per week at school. (Tr. 75-76)[2] (Ms. Catapano has observed Ms. Toor working with the child and testified that Ms. Toor "does really well [because the child] responds well to her and he is motivated by the gym so there's really not much difficulty with him" during occupational therapy sessions. (Tr. 77)) In addition to his work in the McCarton School's sensory gym, the child has one-on-one sessions with Ms. Catapano and Ms. Toor in his classroom. The child also receives group occupational therapy sessions, to work on daily living skills and handwriting. (Tr. 88, 89)

The child's occupational therapy program elements and goals were developed following a standardized evaluation, observation and interviews with the child's parents and teachers. The occupational therapists track his progress against his goals on a daily basis. (Tr. 79-81) As such, when the child masters goals, newer, more challenging ones are added to his repertoire. (Tr. 81-82) Since September, 2006, the child has "made a great deal of progress in all areas" addressed by occupational therapy. For example, in the area of fine motor skills, the child initially was unable to identify letters at the start of the school year; he can now copy almost every letter with minimal assistance. Furthermore, his grasp has improved. His scissors skills have improved. The child's gross motor skills have also improved, as has his confidence to perform gross motor tasks. (Tr. 82-83) The child is more focused and organized. (Tr. 92) Ms. Catapano testified that at the McCarton School, the child "has done really well with the intensity of

_____

[2] Ms. Catapano testified that three 30-minute sessions per week of occupational therapy is insufficient for The child. (Tr. 90-91, 93)

services," and she credited such intensity, coupled with the school's individualized instruction, for the child's success. Ms. Catapano added that the child has "definitely" made significant progress this year. (Tr. 85)

Laura Prestia, M.S., CCC-SLP, is one of four speech pathologists at the McCarton School. (Tr. 102) She works with the child for five hour-long sessions per week, on a one-to-one basis within his classroom. (Tr. 103) Ms. Prestia collaborates with the child's ABA therapists within his classroom, as well as his occupational therapists, in order to ensure consistency in the child's programming. (Tr. 105) Based on a number of assessments conducted on him at the beginning of the school year, Ms. Prestia prepared speech goals for the child. (Tr. 104, 122) Pursuant to instruction from Ms. Prestia, the child uses a DynaVox, an augmentative communication device that is a form of assistive technology. (Tr. 105-106, 110-11)[3] Ms. Prestia sees The child's DynaVox as "a bridge... a support for his verbal language" because "he's got verbal language and it's just a matter of clearing it up for him." (Tr. 113; see also Tr. 141) Ms. Prestia also provides the child with PROMPT therapy during their sessions, and he "responds to [the therapy] very well." (Tr. 112-113, 115-116)

Ms. Prestia recommended that the child continue to receive five hours of speech and language therapy per week through the end of the school year in August. (Tr. 116) Ms. Prestia continuously monitors The child's progress against his goals through data collection, and she noted that the child has "been showing a lot of progress in all of the areas that [they have] worked on." (Tr. 108-109, 116-117, 123; see also Tr. 112) For example, The child's frustration level is "definitely better" than it was at the start of the school year. (Tr. 114) He has been able to progress within his speech and language goal hierarchy. (Tr. 116-117) While the child was a less social child when he entered the McCarton School in September, 2006, he is "definitely getting better" in terms of his social skills, which are worked on during daily play groups at school. (Tr. 119) He is also increasingly interested in his peers. (Tr. 120) The child's capability for expressive word

---

[3] See Tr. 135-136.

output has grown, both in terms of the number of words per sentence and the complexity of the sentence. (Tr. 125-127, 129-130)

The child's parents have also reported progress. The child is "doing great" behaviorally, and his functional communication has increased, as he is much more intelligible and he understands more of what is said to him. (Tr. 310-311, 388) The child's "tantrums are basically gone," i.e., he is tantrumming "[a] few times a week... but not major anymore when he's not getting his way." (Tr. 311-312, 354; see also Tr. 327-328, 387) With the DynaVox, the child can better communicate with his family. (Tr. 387-388) His skill acquisition has also increased. (Tr. 398)

The McCarton School holds frequent parent-teacher conferences in which the child's parents participate. (Tr. 109, 115) The child's instructors and therapists also speak with the C█████s when they visit the school site, on a daily basis. (See Tr. 109, 354) The McCarton School professionals offer the C█████s tips on how to work with the child at home and in the community, and the child's mother labeled the McCarton School staff "very helpful." (Tr. 306-307; see also Tr. 115)

Ms. Seigler observed the child at the McCarton School. (Tr. 452-453, 462, 477) She noted in her McCarton School observation that "The child has made a lot of progress socially. He is a happier child in a smaller setting... He does continue to have outbursts at times but he's made progress in all areas since September [2006]." (Tr. 462-463)

*The equities for 2006-2007*

At the IEP meeting held on June 7, 2006, the DOE failed to offer the child a placement; instead, there was a deferral of the case to the CBST. (Tr. 297) At that meeting, the parents placed the DOE on express notice that they would be seeking reimbursement for the costs and expenses of the child's 2006-2007 program. (Tr. 297, 381) The parents looked at and applied to many programs, including DOE and NYSED "approved" programs, in an effort to find an appropriate place for their son. (Tr. 317; see also Tr. 355, 386) The CBST never got back to them. (Tr. 364, 382) Prior to the 2006-2007 IEP meeting, the parents had not received, much less signed, the contract for the McCarton School. (Tr. 380-382)

CONCLUSIONS OF LAW

Both the IDEA; state law and regulations require that each and every disabled child be provided a FAPE in the LRE appropriate to meet their individual needs. 20 U.S.C. § 1412 (a)(1)(A); 1412 (a)(5)(A); 34 CFR § 300.550(b); 8 NYCRR § 200.4 (c)(4); 8 NYCRR § 200.6 (a)(1). Nonetheless, where as here, the parent has filed a request for relief, the parent bears the burden of persuasion to show that they are entitled to the remedy they seek. Schaeffer v. Weast, 126 Sup. Ct. 528, (2005).

In a tuition reimbursement case, first, the parent bears the burden of persuasion to show that the DOE failed to provide the child with a FAPE. If that burden is met, a board of education may be required to pay for educational services obtained for the child by her parent if the parent is able to show that the services selected by the parent is appropriate. School Comm. of Burlington v. Dept. of Educ. of Mass., 471 U.S. 359, 369-370, 105 S.Ct. 1996, 2002-2003 (1985); Florence County Sch. Dist. Four v. Carter, 510 U.S. 7, 12-14, 114 S.Ct. 361, 364-366 (1993); Frank G. and Dianne G. v. Bd. of Educ. of Hyde Park, 459 F.3d 356 (2d Cir. 2006)

If the parents' placement is appropriate, reimbursement will only be granted if, when equitable considerations are factored in, it is determined the cost of reimbursement is appropriate and reasonable. School Committee of the Town of Burlington v. Department of Education, 471 U.S. 359, 370 (1985); Florence County School District Four v. Carter, 510 U.S.7 (1993). The parents bear the of establishing that the cost is reasonable. Schaeffer v. Weast, 126 Sup.Ct. 528 (2005). The amount of reimbursement is discretionary, and "total reimbursement will not be appropriate if the court determines that the cost of the private education was unreasonable." Florence County, 510 U.S. at 16. The parent also bears the burden of persuasion to show that equitable considerations for the reimbursement he seeks favors her. Schaeffer v,. Weast.

The standard for the parents to meet their burden of persuasion to show that the program they have selected is appropriate is less stringent then the standard of FAPE to which a school district must adhere. Parents are not barred from reimbursement where a private school they choose does not rise to meet the level of the IDEA's definition of a

FAPE. See Frank G. and Dianne G. v. Bd. of Educ. of Hyde Park, supra. The Second Circuit has expressly embraced the concept that the appropriateness of a unilateral educational placement should be subject to a more relaxed standard; the Frank G. Court expressly held that the unilateral placement need not be perfect, need not meet all of the child's special education needs, and need not even be in the child's least restrictive environment.

In this case, the DOE expressly conceded that it failed to offer the child a free and appropriate public education ("FAPE") in both years. (Tr. 60-61, 151) Thus, the parents' burden here is to show the appropriateness of their unilateral placement. The well-settled test for determining the appropriateness of the unilateral placement is whether such placement was "reasonably calculated to enable the child to receive educational benefits." See Frank G., supra, 459 F.3d at 364 (citing Bd. of Educ. v. Rowley, 458 U.S. 176, 207, 102 S.Ct. 3034 (1982); Muller ex rel. Muller v. Comm. on Special Educ., 145 F.3d 95, 105 (2d Cir. 1998)). In that regard, the determination of appropriateness is linked to the question of whether the proposed placement is "likely to produce progress, not regression." Frank G., 459 F.3d at 364 (quoting Walczak v. Florida Union Free Sch. Dist., 142 F.3d 119, 130 (2d Cir. 1998) (in turn quoting Cypress-Fairbanks Indep. Sch. Dist. v. Michael F., 118 F.3d 245, 248 (5th Cir. 1997)). The fact finder is to look for objective evidence as to whether it was likely that the child would make progress. Frank G., 459 F.3d at 364 (referencing Mrs. B. v. Milford Bd. of Educ., 103 F.3d 1114, 1121 (2d Cir. 1997)). The courts are to look to the totality of the circumstances in assessing whether the placement is reasonably calculated to confer educational benefit to the handicapped child. Frank G., 459 F.3d at 364.

In order to meet their burden, the parent must also show that Barrow Street offered an educational program that met the student's special education needs. [Burlington, 471 U.S. at 370; Application of a child with a Disability, Appeal No. 05-008; Application of a child with a Disability, Appeal No. 02-027] To qualify for tuition payments under the IDEA, parents need not show that a private placement furnishes every special service necessary to maximize their child's potential but they must demonstrate

---

that the placement provides "educational instruction specially designed to meet the unique needs of a handicapped child, supported by such services as are necessary to permit the child to benefit from instruction." Rowley, 458 U.S. at 188-89; Frank G. v. Board of Education of Hyde Park, 2006 WL 2077009 (2d Cir.) Nor does the private placement have to be the LRE. Rose v. Chester County Intermediate Unit, 1996 WL 238699, at 9 (E.D. Pa. 1996), Application of Child with a Disability, Appeal No. 03-066 (citing Griggs v. Bd. of Education, 882 F.2d 688, 692 (2d Cir. 1989). Thus, it is the parent's burden to show that the placement that they have chosen is designed to provide or is providing meaningful educational benefit to meet the child's special education needs.

Under these standards the parents failed to meet their burden to establish that the Barrow Street school was an appropriate placement for the child. The record fails to establish that the Barrow Street offered the child any special education services that were "likely to produce progress" in the primary area of the child's then recognized disability, speech and language, or in any other area of disability from which the child suffered. The record fails to establish that the child was receiving any special education instruction or services at all from Barrow Street. Even the child's SEIT testified that Barrow Street did not meet his speech and language needs. Moreover, his parents testified that while at Barrow Street, the child needed the SEIT present all of the time which indicates that the school was simply not equipped to handle the child's special needs.

In addition, the testimony from Ms. Siegler showed that when she observed the child at Barrow Street, the child was not learning there. Testimony from the Mc Carton staff bolsters this conclusion. Ms. Stenmon confirmed that the child was lacking many basic skills when he arrived at Mc Carton school after a year at Barrow Street (Tr. 248). Ms. Stenmon further indicated that despite the contention of Ms Ullah that the placement at Barrow Street was appropriate and the child was ready to be integrated with non-disabled peers during the 2005-2006 school year, at the start of the 2006-2007 school year, he was not ready to be integrated with non-disabled peers (Tr. 250). Ms. Stenmon stated that she would need to systematically monitor his tantrums to document his

improvement and that a narrative method favored by Ms. Ullah (Tr. 199) would not be effective (T. 255).

Moreover, Ms. Ullah's testified that the program at Barrow Street was supposed to work on basic pre-academic skills (Tr. 164). However, there was no concrete evidence offered as to how or if this was accomplished. In light of Dr. Ivy Feldman's testimony, that she would have expected a child in an integrated setting to have more developed academic skills (Tr. 517), it has not been established whether or to what extent the child's pre-academic skills were addressed at Barrow or whether he made any progress with regard to them there.

Accordingly, the parents are not entitled to receive reimbursement for the tuition paid to the Barrow Street for the 2005-2006 school year.

With regard to the issue of reimbursement for the SIET services provided by Ms. Ullah, the parents also have not met their burden. In order for the parent to establish that the child has made progress, they must present some *objective* evidence to show that the child progressed. While no one factor is necessarily dispositive in determining whether the parent's unilateral placement is appropriate it must be "reasonably calculated to enable the child to receive educational benefits" prior to granting tuition payments, Rowley, 458 U.S. at 207. As such, grades, test scores, and regular advancement may constitute evidence that a child is receiving educational benefit...." Frank G. v. Board of Education of Hyde Park, 2006 WL 2077009 (2d Cir.)  Here there was no such objective evidence offered. All that was offered was the subjective testimony from the SEIT herself who did not produce her progress notes or anything else upon which progress of the child could be discerned. She was also not trained and did not use ABA therapy, a technique that, if this child was diagnosed with PDD or otherwise on the autism spectrum, was an appropriate method to employ.  In addition, the testimony from the staff at Mc Carton does not support her testimony that the child progressed last year in any meaningful way. He came to the Mc Carton school lacking many pre-school skills that were expected and Ms. Stenmon criticized the method, which the SEIT used.

Accordingly, the parents have failed to meet their burden, and they are not entitled to be reimbursed for the SIET services provided to the child during the 2005-2006 school year.

On the other hand, the parent has met their burden of persuasion with regard to the 2006-2007 school year for tuition reimbursement at the Mc Carton School. The unrefuted evidence overwhelmingly establishes that the child is making progress at the Mc Carton School and that his placement there is appropriate.

As summarized above, the staff at the Mc Carton school is all trained in special education and in, particular, they are trained to work with children who are PDD or on the autism spectrum. They all work with the child closely and keep extensive data on him daily. They provide ABA services. They described very specific examples of how the child has improved this year. For example, his tantrumming is down to no more than two minutes per day. (Tr. 217) His personal assaults are down to zero. (Tr. 226) His attention has improved dramatically, and "[h]e is able to focus on a teacher and only occasionally is he distracted by other things in the room." (Tr. 241) The child has made gains in communication: For example, he is able to articulate Ms. Stenmon's name ("Stephanie"), whereas before it was just "Stebbie." He is using "Can I have?" or "like" rather than "I want" all the time. (Tr. 229) He is doing well on making spontaneous requests. (Tr. 238) He responds to his name and will wave hello without prompting. (Tr. 234) He is able to follow direction, which he was unable to do at the beginning of the year. (Tr. 235) He is currently working on compliance with commands. (Tr. 226) With living skills, the child has mastered brushing his teeth, and is able to ask to use the bathroom (rather than "go pee-pee") and zip and unzip zippers. (Tr. 245)

The child is able to receptively identify and express all his letters. (Tr. 244) Vocal and verbal imitation program has been put on hold because of the difficulty distinguishing between the child's /m/, /b/, and /f/ sounds, but he working on it with the speech therapist. (Tr. 237) The child is making slow progress with intraverbals (fill in the blank sentences). (Tr. 240) He now is working on rote counting 1 through 20, whereas at the

Hearing Officer's Findings of Fact and Decision                                    20

Case No. 109000

_____

beginning of the year he was unable to count to five. The child is able to match within a field of six, and imitate motor skills. He has mastered patterns. (Tr. 243-244).

The evidence further shows that if the child does not attend a twelve month program during the summer of 2007—which is included in the tuition cost at Mc Carton School for the 2006-2007 school year, that he will regress.

Accordingly, the parents have met their burden establishing that the placement of the child at Mc Carton School, which is a twelve month program, is an appropriate placement for him.

Where, as here, a determination in favor of the parents has been made on the first two prongs for the 2006-2007 school year, a determination must be made and to other equitable considerations. Prior to placing the child at Mc Carton for the 2006- 2007 school year, the parents fully cooperated with the DOE. They placed the DOE on express notice that they would be seeking reimbursement for the costs and expenses of the child's 2006-2007 program. (Tr. 297, 381)  The parents looked at and applied to many programs, including DOE and NYSED "approved" programs, in an effort to find an appropriate place for their son. (Tr. 317; see also Tr. 355, 386)  The DOE failed to offer them a timely placement. (Tr. 364, 382) The parents finally placed the child at Mc Carton late in the summer of 2006 when an opening became available.

In addition, the tuition at Mc Carton is comparable or lower than the tuition at other schools, which serve the same population.

Accordingly, I find that the equities for the 2006-2007 school year favor the parents and that they are entitled to tuition reimbursement for the 2006-2007 twelve month school year (through the summer of 2007) at the Mc Carton school.

Finally, with regard to the parents' request for declaratory relief that the child was erroneously classified for the two school years in question, they have not met their burden. They now claim the child should have been classified as autistic based upon a medical diagnosis made when the child was two by Dr. Mc Carton. However, Dr. Mc Carton did not use the term autistic in her diagnosis. She used the term PDD-NOS, a non-specific disorder. Dr. Pervan's testimony was clear that at the time of Dr. Mc Carton's

Hearing Officer's Findings of Fact and Decision                                      21

Case No.  109000

---

initial diagnosis that the child was PDD-NOS, the State list of educational classifications did not include all medical classifications such as children with such non-specific disorders as PDD-NOS. Instead, DOE classified the child according to his most outstanding deficit. In this case, the child's most prominent deficit was his speech and language impairment. That was confirmed by other experts presented by the parent as well as in the report issued by Dr Bedi in January 2006. (District's Exhibit 3) In fact, even his current teacher stated that she did not believe that the child was autistic.

The fact that the child has now been classified by DOE as autistic is irrelevant as to whether he should have been so classified two years ago. As Dr. Pervan explained, as children get older, their deficits become more distinct and than their educational classification can change.

Accordingly, the parents have not met their burden establishing that the DOE was in error when it gave the child the educational classification of speech and language impairment in 2005-2006 and 2006-2007. Their request for declaratory relief is denied.

**ORDERED** that the parents receive tuition reimbursement for the 2006-2007 school year for the Mc Carton School in the amount of $84, 000 minus any payments, which have been made to the Mc Carton School for the 2006-2007 school year  pursuant to the Interim Order dated February 7, 2007.

Dated:  July 10, 2007

_Judith T. Kramer_ (B)

JUDITH T. KRAMER, ESQ.
Impartial Hearing Officer

JTK:ds

Hearing Officer's Findings of Fact and Decision                                    22

Case No.  109000

---

## PLEASE TAKE NOTICE

Within 35 days of the date of this decision, the parent and/or the New York City Department of Education has a right to appeal the decision to the State Review Officer of the New York State Education Department under Section 4404 of the Education Law and the Individuals with Disabilities Education Act.

"The notice of intention to seek review shall be served upon the school district not less than 10 days before service of a copy of the petition for review upon such school district, and within 25 days from the date of the decision sought to be reviewed. The petition for review shall be served upon the school district within 35 days from the date of the decision sought to be reviewed. If the decision has been served by mail upon petitioner, the date of mailing and the four days subsequent thereto shall be excluded in computing the 25- or 35-day period." (8NYCRR279.2[b]) Failure to file the notice of intention to seek review is a waiver of the right to appeal this decision.

Directions and sample forms for filing an appeal are included with this decision. Directions and forms can also be found in the Office of State Review website: www.sro.nysed.gov/appeals.htm.

Hearing Officer's Findings of Fact and Decision                                     23

Case No.  109000

---

## DOCUMENTATION ENTERED INTO RECORD

**Exhibit Lists**

### Parents' Exhibits

| Ex # | Document | Date | # of Pages |
|------|----------|------|------------|
| A | Request for Impartial Hearing | 1/17/07 | 4 |
| B | Findings of Fact and Decision (2004-2005) by IHO Michael S. Lazan | 9/12/ 05 | 10 |
| C | NYCBOE IEP | 4/21/05 | 16 |
| D | NYCBOE IEP | 6/7/06 | 16 |
| E | Occupational Therapy Progress Report By: Leslie Catapano, M.A., OTR/L and Bari Toor, OTR/L | 1/16/07 | 6 |
| F | Speech and Language Progress Report By: Laura Prestia, M.S., CCC-SLP | 1/07 | 3 |
| G | Occupational Therapy IEP Goals for 2006-2007 with progress notes for January 2007 | 9/06 | 2 |
| H | Programming and Progress Report by Mary Lowery | 6/5/05 | 6 |
| I | Daily Attendance Record 2006-2007 | 2006-07 | 1 |
| J | Enrollment Contract | 7/14/06 | 3 |
| K | Affidavit of Payment | | 1 |
| L | Invoices from McCarton | | 6 |
| M | Description of SEIT Services to be provided with Resume with Certificate attached by Zubeida Ullah, M.S. | 9/6/05 | 5 |
| N | Enrollment Contract for Barrow Street Nursery School | 2/7,/05 | 5 |
| O | Invoices and Proofs of Payment for Elizabeth Cecil, C.S.W. | | 3 |

Hearing Officer's Findings of Fact and Decision                              24

Case No. 109000

| P | Invoices and Proofs of Payment for Zubeida Ullah, M.S. | | 84 |
|---|---|---|---|
| Q | Proofs of Payment to the McCarton Center & School | | 4 |
| R | Proofs of Payment | | 2 |
| S | IEP by the McCarton School | 2006- 07 | 18 |

## DOE's Exhibits

1    IEP dated 6/7/06, 15 pp.
2
3    IEP dated 4/21/05, 19 pp.
4
5    Neuropsychological report dated January 19, 24, 25, 26, 2006, 9pp.